[Nos. 62941-2; 62939-1; 62940-4. En Banc.]

Argued May 29, 1996. Decided May 1, 1997.

INO INO, INC., *Respondent*, v.
THE CITY OF BELLEVUE, *Appellant*.

DEJA VU-BELLEVUE, *Respondent*, v.
THE CITY OF BELLEVUE, *Appellant*.

RONDA REMUS, ET AL., *Respondents*, v.
THE CITY OF BELLEVUE, *Appellant*.

106

ALEXANDER and TALMADGE, JJ., and DURHAM, C.J., dissent in part by separate opinions; SANDERS and JOHNSON, JJ., dissent by separate opinion.

*Preston, Gates & Ellis*, by *Stephen A. Smith* and *Robert B. Mitchell, Jr.*, for appellant.

*Gilbert H. Levy*; and *Burns & Hammerly, P.S.*, by *Jack R. Burns* and *John L. Carroll, Jr.*, for respondents.

*P. Cameron De Vore, Gregory J. Kopta*, and *Kraig Baker* on behalf of the Free Speech Coalition, amicus curiae.

110

MADSEN, J. — At issue in this case are provisions of a Bellevue City ordinance regulating adult cabarets. Two adult entertainment corporations and three dancers (Respondents) challenged the constitutionality of the ordinance under both the First Amendment and WASH. CONST. art. I, § 5. The trial court upheld all but one of the challenged provisions and awarded fees to the City of Bellevue for dissolving a temporary restraining order. The City of Bellevue (Appellant) appealed and the Respondents cross-appealed. We affirm in part, reverse in part, and remand for a determination of attorneys' fees.

## STATEMENT OF THE CASE

In November 1993, the Bellevue City Council adopted Ordinance 4602, the City's first ordinance regulating adult cabarets. Clerk's Papers (CP) at 311 (Ino Ino, Inc., finding of fact 6).[1] The ordinance contained a statement that the City would regulate adult cabarets to prevent "significant criminal activity" that "historically and regularly" has occurred, while preserving constitutionally protected expression. Ordinance 4602 (1993). The City later amended the ordinance by adopting Ordinance 4735 in January 1995, and Ordinance 4745 in March 1995.

The challenged ordinances, codified as Bellevue City Code (BCC) § 5.08, regulate various aspects of adult cabarets. Specifically, BCC § 5.08.010(B) defines "adult entertainment" and thus determines which businesses must comply with the regulations. Section 5.08.070(A)(1) provides that nude or semi-nude dancers must perform on

---

[1] "Ino Ino Clerk's Papers" refers to clerk's papers submitted in *Ino Ino., Inc. v. City of Bellevue*, No. 95-2-02025-9 and received in the clerk's office on June 26, 1995. "Deja-Vu Clerk's Papers" refers to clerk's papers submitted in *Deja Vu-Bellevue, Inc. v. City of Bellevue*, No. 94-2-22796-3. "Remus Clerk's Papers" refers to clerk's papers submitted in *Remus, et al. v. City of Bellevue*, No. 94-2-27797-9.

an elevated stage at least eight feet from patrons. According to section 5.08.070(A)(6), dancers performing on the nonstage area of the adult cabaret must be at least four feet from any member of the public. Section 5.08.070(D)(2) establishes a minimum level of lighting; and section 5.08.070(E) requires adult cabarets to close from 2 a.m. to 10 a.m. Section 5.08.040 establishes licensing requirements for operators, managers, and dancers. Section 5.08.070(B)(2) prohibits nude performances or graphic representations of such performances outside of adult cabarets.

Respondents Deja Vu-Bellevue, Inc.; Ino Ino, Inc. (owner of adult cabarets Papagayo's and Babes); and dancers Rhonda Remus, Esmeralda Silva, and Victoria McKnight filed suit to have the ordinances declared unconstitutional. On February 24, 1995, the King County Superior Court issued an order temporarily restraining the City from enforcing the four-foot distance requirement for individual dances in adult cabarets. Under Civil Rule (CR) 65(c), the court required that the adult cabarets post a bond for $5,000. At the request of the adult cabarets and dancers, the court consolidated the preliminary hearing with a trial on the merits under CR 65(a)(2). From March 13 to March 20, 1995, the court heard evidence regarding the manner in which adult cabarets operate in King County.

At trial, Respondents presented evidence that dancers, or entertainers, are independent contractors who pay adult cabarets $65 or more to work a six- to eight-hour shift. An entertainer performs uncompensated nude dances on stage in order to attract the attention of patrons, who can then purchase individual performances near their tables and couches, hence the term "table dance" or "couch dance." CP at 313, 316 (Ino Ino, Inc., findings of fact 11, 23). Entertainers receive their income from the individually compensated dances. Under this system, numerous dancers may perform simultaneously throughout the cabaret, but they are prohibited from engaging in sexual contact with patrons. BCC § 10A.88 ("Offenses Against Public Morals").

Individual Respondents testified that patrons would be unwilling to pay for table dances that complied with the new restrictions on distance and lighting. These restrictions would detract from the intimacy that is part of the message in table dances. Corporate Respondents presented evidence that compliance with the four-foot minimum distance rule would hurt them economically to the point of shutting down their businesses, and thus would restrict constitutionally protected speech. Respondents made this prediction on the assumption that the ordinance required at least four feet between the patrons' and dancers' outstretched arms (or about eight to nine feet between torsos).

At the conclusion of the evidence, the trial court dissolved the temporary restraining order and denied a temporary or permanent injunction. The court upheld all of the provisions of the Bellevue ordinances except the outdoor prohibition in BCC § 5.08.070(B)(2), which the court struck down as overbroad. The court awarded the City attorneys' fees for dissolving the temporary restraining order, but limited the award to the amount of the bond. The court declined to award the adult cabarets and the individual dancers attorneys' fees under 42 U.S.C. § 1988 (1994).

## DISCUSSION

### I

#### Trial Court's Findings of Fact

■ Initially, Respondents challenge several of the trial court's findings of fact. An appellate court must affirm a trial court's findings of fact if they are based on live testimony and supported by substantial evidence. *Bering v. Share*, 106 Wn.2d 212, 220-21, 721 P.2d 918 (1986), *cert. dismissed*, 479 U.S. 1050 (1987). Substantial evidence exists when the record contains evidence of sufficient quantity to persuade a fair-minded, rational person that the declared premise is true. *World Wide Video, Inc. v.*

*City of Tukwila*, 117 Wn.2d 382, 387, 816 P.2d 18 (1991) (quoting *Bering*, 106 Wn.2d at 220), *cert. denied,* 503 U.S. 986 (1992).

In this case, the trial court found that illegal exposure and sexual contact occurred at adult cabarets. These findings were based on testimony from Bellevue police officers who had performed undercover investigations and communicated with officers from surrounding jurisdictions. The Bellevue officers reported numerous instances of improper sexual conduct at Babes and Papagayo's.

Some entertainers rubbed their buttocks into the groin areas of undercover officers. Others fondled customers' genitals or exposed their breasts and genitals during individual dances. Based upon the officers' testimony, the trial court also found that low lighting and close proximity between patrons and dancers hindered the officers' ability to detect violations that may have been occurring elsewhere in the club.

The court found further that the City had enacted the ordinances in order to control the illegal exposure and sexual contact, or "secondary effects," of live adult entertainment. CP at 314 (Ino Ino, Inc., finding of fact 15). The court based this finding on the testimony of an Assistant City Attorney who had drafted the four-foot rule and former city council members who had voted for its adoption. According to their testimony, they had intended that this provision place patrons and dancers just out of arm's reach.

The trial court also found that the distance restrictions did not prevent patrons from perceiving the eroticism of the dancers' performances. With respect to the restriction for stage dances, the court found that patrons can receive a dancer's erotic message even when they are 8 to 40 or more feet away from the stage. Increasing the minimum distance between patrons and stage dancers from six feet to eight feet resulted only in a loss of some seating.

With respect to the restriction for table dances, the trial court found that a dancer can convey eroticism from a

distance of four feet from the patron's torso. Based upon a dance expert's testimony, the court found that the four-foot rule allowed a patron to see the dancer's entire body and expressive activity. The trial court also found that Papagayo's had not complied with the City's four-foot restriction on table and couch dances. Moreover, the adult cabaret, Babes, which was owned by Respondent Ino Ino, Inc., had eliminated individual dances rather than comply with the four-foot rule.

Based on the record, we hold that substantial evidence supports the challenged findings and accordingly affirm the trial court's findings of fact.

## II
### Constitutionality of Bellevue's Adult Entertainment Ordinances

Respondents next challenge the trial court's conclusion that the provisions of Bellevue's ordinances, with the exception of BCC § 5.08.070(B)(2), restrict only conduct, and that even if they restrict expression they permissibly regulate only the time, place, or manner of expression. Respondents claim that the ordinances violate the federal and state constitutions. Respondents also argue that the expressive element of nude dancing is entitled to broader protection under the Washington Constitution. Because Respondents' primary argument centers on the state constitution we begin there.

An appellate court reviews issues of law de novo. *State v. Campbell,* 125 Wn.2d 797, 888 P.2d. 1185 (1995). The State bears the burden of justifying a restriction on speech. *Collier v. City of Tacoma,* 121 Wn.2d 737, 753, 854 P.2d 1046 (1993); *Spokane Arcades, Inc. v. Brockett,* 631 F.2d 135, 138 (9th Cir. 1980), *aff'd,* 454 U.S. 1022 (1981), *reh'g denied,* 454 U.S. 1165 (1982). In *State v. Gunwall,* 106 Wn.2d 54, 58, 720 P.2d 808, 76 A.L.R.4th 517 (1986), we enumerated several nonexclusive criteria which a court should consider to determinewhether, in a given situation, it is appropriateto resort to the Washington Consti-

tution for separate and independent state grounds of decision: (1) the textual language; (2) differences in the texts; (3) constitutional history; (4) preexisting state law; (5) structural differences; and (6) matters of particular state or local concern. The same factors have been analyzed to determine whether the state constitution ultimately provides greater protection than its corresponding federal provision. *State v. Boland*, 115 Wn.2d 571, 575, 800 P.2d 1112 (1990).

As this court noted in *State v. Reece*, "[t]he question to be asked here is not whether the concept of free speech is interpreted more broadly under the state constitution than under the federal constitution. This court has already answered this question in the affirmative." *State v. Reece*, 110 Wn.2d 766, 778, 757 P.2d 947 (1988), *cert. denied*, 493 U.S. 812 (1989). Instead, the inquiry must focus on the specific context in which the state constitutional challenge is raised. Even where a state constitutional provision has been subject to independent interpretation and found to be more protective in a particular context, it does not follow that greater protection is provided in all contexts. *See State v. Russell*, 125 Wn.2d 24, 57, 882 P.2d 747 (1994), *cert. denied,* 514 U.S. 1129, 115 S. Ct. 2004 (1995); *State v. Reece*, 110 Wn.2d 766, 777-78, 757 P.2d 947 (1988) (stating that the proper inquiry under *Gunwall* is whether "on a given subject matter" the Washington constitutional provision should give greater protection than the minimum protection afforded by the federal constitution), *cert. denied*, 493 U.S. 812 (1989). Application of this principle has also been evident in this court's interpretation of CONST. art. I, § 7. *See, e.g., Bedford v. Sugarman*, 112 Wn.2d 500, 507, 772 P.2d 486 (1989) (noting that art. I, § 7 gives enhanced protection against certain governmental searches and seizures, but declining to consider the extent to which this provision guarantees a more general right of privacy); *see also Ramm v. City of Seattle*, 66 Wn. App. 15, 27, 830 P.2d 395 (holding that art. I, § 7 offers the same degree of protection as its federal

counterpart in matters not involving search and seizure), *review denied*, 120 Wn.2d 1018 (1992).

Thus, in *Reece* we identified the issue as "whether *obscenity* is to be afforded broader protection under the state constitution than under the federal constitution." *Reece*, 110 Wn.2d at 778. We examined the *Gunwall* factors and concluded that in the context of obscenity, art. I, § 5 does not afford broader protection. Similarly, when faced with a challenge to Seattle's telephone harassment law, under art. I, § 5 we found no justification for extending greater protection under the state constitution for speech in nonpublic fora and applied the federal standard. *City of Seattle v. Huff*, 111 Wn.2d 923, 926, 767 P.2d 572 (1989). The federal analysis also applies when confronting art. I, § 5 challenges to regulations of commercial speech. *National Fed'n of Retired Persons v. Insurance Commn'r*, 120 Wn.2d 101, 119, 838 P.2d 680 (1992). In *JJR Inc.*, we declined to extend the full protection of art. I, § 5 to licensure of nude dancing, observing that nude dancing "clings to the edge of protected expression." *JJR Inc. v. City of Seattle*, 126 Wn.2d 1, 9, 891 P.2d 720 (1995). Most recently, we reaffirmed that art. I, § 5 extends no greater protection than its federal counterpart when evaluating false or defamatory statements. *Richmond v. Thompson*, 130 Wn.2d 368, 382, 922 P.2d 1343 (1996).

The issue here, then, is whether nude or sexually explicit dancing is to be afforded greater protection under the state constitution than under its federal counterpart.

The first factor to consider in the *Gunwall* inquiry is the text of the state constitution. Article I, § 5 provides that "[e]very person may freely speak, write and publish on all subjects, being responsible for the abuse of that right." This court has interpreted the text of this provision in evaluating time, place, and manner regulations, and claims of prior restraint and overbreadth.

In *Collier*, the court recognized that the "broad language of Const. art. I, § 5" justifies a more protective standard for evaluating governmental restrictions on political

speech. *Collier,* 121 Wn.2d at 748. The standard adopted by this court for evaluating time, place, and manner restrictions on speech requires the government to show a compelling state interest. *Id.* at 747; *Bering,* 106 Wn.2d at 234.

Regulations which rise to the level of prior restraints may be subject to an even stricter standard. Holding that the language of art. I, § 5 forbids prior restraints on publication, we have struck down prior restraints in most contexts, allowing only postpublication sanctions to punish the abuse of free speech rights. *See, e.g., State v. Coe,* 101 Wn.2d 364, 374-75, 679 P.2d 353 (1984) (holding that the language of art. I, § 5 forbids prior restraints on the publication or broadcast of constitutionally protected speech that was lawfully obtained, true, and a matter of public record). The strict standard for evaluating prior restraints under the state constitution lies in the plain language of CONST. art. I, § 5 which "seems to rule out prior restraints under *any* circumstances." *Bering,* 106 Wn.2d at 242 (quoting *Coe,* 101 Wn.2d at 374). In the context of adult entertainment, however, the court has declined to afford the full protection of art. I, § 5, observing that nude dancing "clings to the edge of protected expression." *See JJR Inc.,* 126 Wn.2d at 9.

In regard to claims of overbreadth, the text of art. I, § 5 is less tolerant than the First Amendment of overbroad restrictions on expression when such restrictions rise to the level of a prior restraint. *O'Day v. King County,* 109 Wn.2d 796, 804, 749 P.2d 142 (1988).

The broad language of art. I, § 5 has been found to warrant greater protection for speech, both spoken and written, in some contexts. However, it has not previously been applied to extend greater protection to expressive conduct or sexually explicit dance. Moreover, art. I, § 5 mentions only the right to speak, write and publish. In the absence of language relating to expressive conduct, we do not find that the text of art. I, § 5 justifies extending greater protection to the adult performances at issue here.

The second factor to consider is the difference in the texts of the federal and state constitutions. The text of the First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech." U.S. CONST. amend. I. This court has found the difference in text between art. I, § 5 and the First Amendment justifies an independent interpretation as noted above.

With respect to time, place, and manner restrictions, federal courts have interpreted the First Amendment as requiring only a substantial or important state interest. *See City of Renton v. Playtime Theatres, Inc.,* 475 U.S. 41, 50, 106 S. Ct. 925, 89 L. Ed. 2d 29 (applying to time, place, and manner restrictions on pure speech a test requiring a "substantial" governmental interest), *reh'g denied,* 475 U.S. 1132 (1986); *United States v. O'Brien,* 391 U.S. 367, 377, 88 S. Ct. 1673, 20 L. Ed. 2d 672 (applying to time, place, and manner restrictions on expressive conduct a test requiring an "important or substantial" governmental interest), *reh'g denied,* 393 U.S. 900 (1968).

In contrast, because of its broad language, CONST. art. I, § 5 has been interpreted to offer greater protection than the First Amendment in the context of pure noncommercial speech in a traditional public forum. *See Collier,* 121 Wn.2d at 747 (time, place, and manner restriction on political speech in traditional public forum of streets and sidewalks must serve compelling state interest); *Bering,* 106 Wn.2d at 233-34 (time, place, and manner restriction on abortion clinic protest on city streets and sidewalks must meet compelling governmental interest test).

In other contexts, however, this court has followed the federal standard when evaluating time, place, and manner restrictions. *See Huff,* 111 Wn.2d 923; *Reece,* 110 Wn.2d 766; *National Fed'n of Retired Persons,* 120 Wn.2d 101.

In some cases, art. I, § 5 also provides more protection against prior restraints. For example, federal courts have held under the First Amendment that delays in issuing dancers' licenses, but not operators' licenses, constitute a

prior restraint.[2] By contrast, in *JJR Inc.*, we made no distinction between operators' and dancers' licenses in holding that suspension or revocation of either type of license constitutes a prior restraint. However, as noted above, the court did not extend the full protection of CONST. art. I, § 5.

With respect to claims of overbreadth, the Supreme Court has interpreted the First Amendment by stating, "particularly where conduct and not merely speech is involved, we believe that the overbreadth of a statute must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep." *New York v. Ferber*, 458 U.S. 747, 770, 102 S. Ct. 3348, 73 L. Ed. 1113 (1982) (quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 615, 93 S. Ct. 2908, 37 L. Ed. 2d 830) (1973)).

A comparison of the language in the First Amendment and CONST. art. I, § 5 does not dictate adoption of a more protective state doctrine for determining overbreadth. *See State v. Talley*, 122 Wn.2d 192, 209, 858 P.2d 217 (1993) (stating that Washington courts apply a federal analysis to claims of overbroad restrictions on speech). *See also O'Day,* 109 Wn.2d at 804 (applying the federal test for overbreadth but finding more protection if overbreadth rises to the level of a prior restraint).

It is clear that the differences in the texts of art. I, § 5 and the First Amendment may justify a different interpretation under the state constitution. It is also clear that greater protection under the state constitution is not war-

---

[2]The Ninth Circuit Court of Appeals expressly distinguished between operators and dancers, finding that a five-day delay for dancers, but not operators, infringed upon the exercise of First Amendment rights. *Kev, Inc. v. Kitsap County*, 793 F.2d 1053, 1060 n.6 (9th Cir. 1986) (finding that the delay in issuing an operator's license gave the police department time to allocate resources to ensure compliance with the city ordinance). *See also TK's Video, Inc. v. Denton County*, 24 F.3d 705, 708-09 (5th Cir. 1994) (upholding a 60-day period for processing operator's license applications, during which county officials performed background checks, made identification cards, and policed zoning arrangements); *World Wide Video, Inc. v. City of Tukwila*, 117 Wn.2d 382, 392-94, 816 P.2d 18 (1991) (holding under the federal constitution that time-consuming and necessary investigations justified a 30-day license approval period for operators of peep show booths), *cert. denied*, 503 U.S. 986 (1992).

ranted in every context. Respondents have failed to explain how the difference in texts justifies greater state constitutional protection in the context of sexually explicit nude and semi-nude dancing.

The third factor to consider is constitutional history. Although the State Constitutional Convention adopted the most protective of three proposed free speech provisions, this choice sheds no light on whether the drafters intended that art. I, § 5 give greater protection than the federal constitution in this context. *See Russell, Reece, Sugarman,* and *Ramm,* (indicating that state constitutional provisions may offer greater protection only in certain contexts).

■ The fourth factor in a *Gunwall* analysis is preexisting state law. State cases and statutes from the time of the constitution's ratification, rather than recent case law, are more persuasive in determining whether the state constitution gives enhanced protection in a particular area. *See Reece,* 110 Wn.2d at 779 (noting, as part of its *Gunwall* analysis, that Washington criminalized obscenity both immediately prior to and after ratification of the state constitution); *Gunwall,* 106 Wn.2d at 66 (looking to the prestatehood Code of 1881 for evidence that the state constitution gives enhanced protection for telephonic communications).

The city cites a case published in 1893 in which this court interpreted a statute to proscribe only businesses providing a public show "which openly outrages decency and tends to corrupt the public morals." *State v. Brown,* 7 Wash. 10, 13, 34 P. 132 (1893). The statute in question provided for the abatement as nuisances of "all . . . structures used as a place of resort, where women are employed to draw custom, dance, or for purposes of prostitution . . . ." *Id.* at 11 (citing HILL'S GEN. STAT., Vol. I, § 2894 (1891)).

Respondents offer no evidence that the constitution's drafters intended, in the context of sexually explicit nude and semi-nude dancing, to impose a stricter standard for regulations challenged as overbroad or as unduly restrict-

ing the time, place, or manner of expression. Neither do Respondents cite recent case law to support this proposition.

In regard to prior restraints, Respondents cite our recent decision in *JJR Inc.,* to argue that the state constitution provides more protection than its federal counterpart against prepublication sanctions. In *JJR Inc.,* we invalidated as a prior restraint a provision allowing revocation and suspension of operators' licenses without sufficient procedural safeguards. *JJR Inc.,* 126 Wn.2d at 9. The provision suppressed future expression because establishments with revoked or suspended licenses were prohibited from showcasing nude dancing. *Id.* at 8. We declined to apply the general rule categorically invalidating all prior restraints, stating that an adult entertainment licensing scheme providing for revocation or suspension of licenses was valid provided that procedural safeguards were available.[3] *Id.*

Thus, preexisting state law justifies a greater degree of protection from regulations which impose prior restraint on the expressive conduct of sexually explicit dance, but does not support application of the more rigorous time, place, and manner analysis developed in the context of pure speech in a traditional public forum.

The fifth *Gunwall* factor to consider is the structural difference between the federal and state constitutions. The federal constitution is a grant of enumerated powers, while the state constitution acts as a limitation on the otherwise plenary powers of state government. *Reece,* 110 Wn.2d at 780 (citing *Gunwall,* 106 Wn.2d at 62). This distinction simply reinforces this court's responsibility to engage in independent state analysis and afford broader protection when necessary. *Id.*

---

[3]In *O'Day,* we held that the language of art. I, § 5 categorically prohibits prior restraints on constitutionally protected speech. *O'Day v. King County,* 109 Wn.2d 796, 804, 749 P.2d 142 (1988). However, the provision allows prior restraints on obscene speech, which receives no constitutional protection. *State v. Coe,* 101 Wn.2d 364, 375, 679 P.2d 353 (1984) (*citing City of Seattle v. Bittner,* 81 Wn.2d 747, 757, 505 P.2d 126 (1973) (obscenity) and *Fine Arts Guild, Inc. v. City of Seattle,* 74 Wn.2d 503, 445 P.2d 602 (1968) (obscenity)).

The sixth factor is whether this case raises a matter of particular state or local concern. With regard to adult entertainment, Respondents state only that "activities of this nature have been traditionally regulated by municipalities." Br. of Resp't at 28. This factor favors an independent state analysis; however, we do not agree that greater protection follows, because, as Appellant points out, both state and local law regulated or prohibited dancing early in this state's history. Appellant cites a Washington statute enacted in 1889 granting cities the authority to "prohibit or suppress, or license or regulate all dance houses . . . ." BALL. CODE § 855(4) (1897). Appellant also points to *Pearson v. City of Seattle*, 14 Wash. 438, 439, 44 P. 884 (1896), concerning a City of Seattle ordinance prohibiting dances in any saloon or in any place in connection with liquor sales. We conclude that while traditional regulation by municipalities supports independent analysis under the state constitution, it does not support enhanced protection for self-expression through sexually explicit dancing.

■ Respondents fail to show that the sexually explicit dance at issue in this case warrants application of the more protective time, place, and manner analysis developed under art. I, § 5 of the state constitution. Nor is greater protection indicated with regard to the claims of overbreadth not rising to the level of prior restraint. Therefore, we will evaluate Respondents' claims of overbreadth and challenges to time, place, or manner regulations by applying federal constitutional law. However, the text and history of CONST. art. I, § 5 dictate enhanced protection under the state constitution in the context of adult entertainment regulations that impose prior restraints.

### A.

### Licensing Scheme

Respondents argue that the 14-day processing period for

managers' licenses established in BCC § 5.08.040(C)(3), with no issuance of temporary licenses during this period, is an unconstitutional prior restraint. Respondents point out that section (C)(4) provides for the issuance of temporary licenses to dancers, but not to managers.

■ We find that a 14-day delay in issuing a manager's license is similar to the revocation and suspension of an operator's license in *JJR Inc.* The delay in issuing a manager's license suppresses future expression because the City permits nude dancing only if licensed managers are present. Although in *JJR Inc.,* we stated that a provision revoking or suspending licenses was constitutional if it provided for a stay pending judicial review, no such procedural safeguards would cure the constitutional infirmities of BCC § 5.08.040(C)(3). *JJR Inc.,* 126 Wn.2d at 10-11. Therefore, we hold that the City's failure to provide managers with temporary licenses during the 14-day delay constitutes a prior restraint in violation of the Washington Constitution.

Respondents also claim that BCC § 5.08.040(C)(1), which requires the disclosure of information such as recent criminal convictions and employment history,[4] violates privacy rights guaranteed by article I, section 7 of the state constitution. This court previously analyzed art. I, § 7 in *Gunwall*, covering factors 1, 2, 3, and 5. *Gunwall,* 106 Wn.2d at 65-68. We need only analyze factors 4 and 6, which are generally unique to the context presented by the individual case. *State v. Johnson,* 128 Wn.2d 431, 445, 909 P.2d 293 (1996).

---

[4]BCC § 5.08.040(C)(1) requires entertainers and managers to provide the applicant's name, home address, home telephone number, date and place of birth, fingerprints taken by the Bellevue Police Department, social security number, and any stage names or nicknames used in entertaining; the name and address of each business at which the applicant intends to work; documentation that the applicant is at least eighteen years old; a complete statement of all convictions within the last five years preceding the date of the application, except for parking violations and minor traffic infractions; a description of the applicant's principal activities or services to be rendered; and a two by two inch photograph of the applicant, taken within six months of the date of application showing only the full face.

■ Under the fourth *Gunwall* factor we examine preexisting state law. Although Respondents point to the "heightened protection" of art. I, § 7, Br. of Resp't Deja Vu at 45, they cite only cases of warrantless search and seizure in which this court held that the state constitution offers more protection than the Fourth Amendment. *See, e.g., State v. Stroud,* 106 Wn.2d 144, 148, 720 P.2d 436 (1986) (warrantless search of automobile); *State v. Boland,* 115 Wn.2d 571, 578, 800 P.2d 1112 (1990) (warrantless search of garbage). Our decision in *O'Hartigan v. Department of Personnel,* 118 Wn.2d 111, 117, 821 P.2d 44 (1991) is more persuasive in this case. There the court recognized two types of interests protected by the right to privacy: the right to autonomous decisionmaking and the right to nondisclosure of intimate personal information, or confidentiality. In questions involving the latter right, the state constitution offers no greater protection than the federal constitution, which requires only application of a rational basis test. *Id.* at 117-18; *In re A, B, C, D, E,* 121 Wn.2d 80, 97, 847 P.2d 455 (1993).

The sixth factor considers whether the regulated matter is of particular state or local concern. Respondents merely state that "the matter before the Court involves matters that are uniquely of local concern." Br. of Resp't at 41. Without more we are unpersuaded that the state constitution offers greater protection in this context.

■■ Because the interest in confidentiality or nondisclosure of personal information is not "a fundamental right requiring utmost protection" we conclude that a rational basis test applies to Respondents' privacy claim in this case. *O'Hartigan,* 118 Wn.2d at 117. The rational basis test requires that a regulation be carefully tailored to meet a legitimate governmental goal. *Id.; BSA, Inc. v. King County,* 804 F.2d 1104, 1111 (9th Cir. 1986). Here the trial court found that the licensing requirements advance several legitimate goals. They protect minors, assure the correct identification of persons working in adult cabarets, enable the City to deploy law enforcement resources ef-

fectively, and detect and discourage the involvement of organized crime in the adult entertainment industry. We find that the disclosure provisions are valid under the rational basis test because they require only the type of information that would advance these goals.

## B.
### Distance Requirements

Two distance requirements are at issue here: the four-foot requirement between dancers and patrons during individual performances and the eight-foot requirement between stage dancers and patrons. Respondents challenge the four-foot rule for individual dances as a prior restraint on expression.[5]

■ Before we will apply the highly protective rules against prior restraints, first we must determine whether the challenged rule affects expression. Respondents presented evidence that entertainers use close proximity during table and couch dances to convey a message of erotic intimacy. The trial court acknowledged this evidence in finding of fact 27.

Courts previously have held that the communication of a nude dancer receives constitutional protection, although nudity itself is conduct subject to the police powers of the state. *See, e.g., Kitsap County v. Kev, Inc.,* 106 Wn.2d 135, 140, 720 P.2d 818 (1986); *Barnes v. Glen Theatre, Inc.,* 501 U.S. 560, 565, 111 S. Ct. 2456, 115 L. Ed. 2d 504 (1991) (plurality opinion); *Id.* at 581 (Souter, J., concurring); *Id.* at 587 (White, Marshall, Blackmun, and Stevens, JJ., dissenting); *O'Day,* 109 Wn.2d at 802. Based on Respondents' evidence and the trial court's findings of fact, we conclude that the four-foot rule does regulate expression.

---

[5]BCC § 5.08.070(A)(6) provides:

No employee or entertainer mingling with members of the public shall conduct any dance, performance or exhibition in or about the nonstage area of the adult cabaret unless that dance, performance or exhibition is performed at a distance of no less than four feet from any member of the public.

■ Respondents also must show that the challenged regulation rises to the level of a prior restraint, and thus is subject to the more protective rules against prior restraints than those against regulations affecting only the time, place, or manner of expression. This court has defined prior restraints as "official restrictions imposed upon speech or other forms of expression in advance of actual publication." *City of Seattle v. Bittner*, 81 Wn.2d 747, 756, 505 P.2d 126 (1973) (quoting Thomas I. Emerson, *The Doctrine of Prior Restraint*, 20 LAW & CONTEMP. PROBS. 648 (1955)). We have applied prior restraint analysis in cases involving licensing schemes and court orders that effectively banned speech. For example, in *Bittner* we held that government officials imposed prior restraints when they required licensing for operation of adult entertainment establishments, but refused to issue licenses to applicants who previously had engaged in illicit activities. *Bittner*, 81 Wn.2d at 755-56; *see also JJR Inc.*, 126 Wn.2d at 6 (licensing scheme); *Coe*, 101 Wn.2d at 372 (court order); *State ex rel. Superior Court v. Sperry*, 79 Wn.2d 69, 75-78, 483 P.2d 608 (court order), *cert. denied*, 404 U.S. 939 (1971).

■ However, not every regulation of speech or expression rises to the level of a prior restraint. This court has analyzed regulations which do not ban expression but impose temporal or geographic limitations as time, place, or manner restrictions. *See Collier*, 121 Wn.2d at 747 (analyzing an ordinance which did not completely ban political signs as a time, place, or manner restriction); *Coe*, 101 Wn.2d at 373 (stating that a regulation may not rise to the level of a prior restraint if it merely restricts the time, place, or manner of expression).

Respondent Ino Ino, Inc., argues that under CONST. art. I, § 5 the distance restriction is unconstitutional as a prior restraint because the restriction denies entertainers a "full opportunity to use space and proximity as an element of their dance" and "the individual has no opportunity to demonstrate in a judicial forum that there is

no basis for imposing the restraint." Br. of Resp't at 35-36. Ino Ino, Inc., claims that a party subjected to this restriction should have the same procedural rights as one who faces abatement. *Id.* This requirement would be "consistent with the text of art. I, § 5 that free speech rights should not be abridged, unless they have been previously abused." *Id.* Respondents thus base their prior restraint claim on the premise that each adult cabaret should have an opportunity to show that it prohibits public sexual contact before the City can require compliance.

A regulation is not a prior restraint, however, simply because a party can present evidence that it does not cause the problems targeted by the regulation. *Ward v. Rock Against Racism,* 491 U.S. 781, 801, 109 S. Ct. 2746, 105 L. Ed. 2d 661 (stating that the validity of a regulation depends on its relation to the overall problem a city seeks to correct), *reh'g denied,* 492 U.S. 937 (1989). Moreover, the four-foot distance regulation at issue here does not ban table dancing. Rather, it imposes a place or manner restriction on the performance of the dance. Thus, it is more properly analyzed as a time, place, or manner restriction. BCC § 5.08.130 also provides the individual cabaret an opportunity to establish in a judicial proceeding that it complies with the distance requirements before the city can impose sanctions.[6]

Respondents have failed to show that the four-foot rule for individual dances rises to the level of a prior restraint. Nevertheless, the rule does regulate the time, place, or manner of expression. Under *O'Brien,* 391 U.S. at 377, the government's regulation of the time, place, or manner of expressive conduct is sufficiently justified if (1) the regulation is within the constitutional power of the government;

---

[6]BCC § 5.08.130 provides:

A. Public nuisance. Any adult cabaret operated . . . in violation of . . . any law of the City of Bellevue . . . shall be . . . declared to be . . . a public nuisance. The city attorney may . . . commence an action to enjoin, remove or abate such nuisance in the manner provided by law and shall take such other steps and apply to such court or courts as may have jurisdiction to grant such relief as will abate or remove such public nuisance[.]

(2) the regulation furthers an important or substantial governmental interest; (3) the governmental interest is unrelated to the suppression of free expression; and (4) the incidental restriction on alleged First Amendment freedoms is no greater than essential to the furtherance of that interest. In this case, the *O'Brien* test is the applicable standard.[7] *See Barnes*, 501 U.S. at 566.

The four-foot rule meets the requirements of the *O'Brien* test. The provision is within the constitutional power delegated by the State to the City of Bellevue to protect the health and welfare of its citizens. *See State v. Brayman*, 110 Wn.2d 183, 192-93, 751 P.2d 294 (1988) (stating that art. I, § 1 of the Washington Constitution empowers the Legislature to enact laws promoting the health, peace, safety, and general welfare of the people).

 The provision furthers an important or substantial governmental interest because it facilitates the detection of public sexual contact and discourages contact from occurring in the first place. Courts have recognized the government's substantial interest in curbing these secondary effects of adult entertainment. *See, e.g., City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 48, 106 S. Ct. 925, 89 L. Ed. 2d 29 (holding that the City of Renton had a

---

[7]Whether the *O'Brien* test for expressive conduct offers the same degree of protection for the right to free speech as the traditional time, place and manner test is unclear. According to a case from the Ninth Circuit Court of Appeals, the *O'Brien* test for expressive conduct and the time, place or manner test for pure speech protect these forms of expression to the same degree. *See Kev, Inc. v. Kitsap County*, 793 F.2d 1053, 1058 (9th Cir. 1986) (interpreting *Young v. American Mini Theatres, Inc.*, 427 U.S. 50, 96 S. Ct. 2440, 49 L. Ed. 2d 310, *reh'g denied*, 429 U.S. 873 (1976)). Furthermore, in *Clark v. Community for Creative Non-Violence*, 468 U.S. 288, 298, 104 S. Ct. 3065, 82 L. Ed. 221 (1984), the Supreme Court stated that there is "little, if any" difference between the time, place, or manner test and the four-factor *O'Brien* test for expressive conduct. Contrary to those cases, however, a relatively recent Supreme Court case suggests that the federal courts do distinguish between the two forms of expression. Four Supreme Court Justices continue to interpret *O'Brien* as providing less protection to expressive conduct than to pure speech. *Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 566, 111 S. Ct. 2456, 115 L. Ed. 2d 504 (1991) (plurality opinion of Rehnquist, C.J., Kennedy and O'Connor, JJ.) (interpret *O'Brien* as rejecting the contention that symbolic speech is entitled to full First Amendment protection.); *Id.* at 582 (Souter J., concurring) (agreeing with the plurality that the appropriate analysis was the *O'Brien* test "for judging the limits of . . . state action burdening *expressive acts as distinct from pure speech* . . . .") (Emphasis added).

substantial interest in combating the undesirable secondary effects of adult theaters, such as crime and a drop in property values), *reh'g denied,* 475 U.S. 1132 (1986); *Barnes,* 501 U.S. at 582 (Souter, J., concurring) (stating that the governmental interest in combating secondary effects of adult entertainment establishments is substantial); *BSA, Inc. v. King County,* 804 F.2d 1104, 1111 (9th Cir. 1986) (recognizing sexual contact as a secondary effect of adult entertainment). Furthermore, Bellevue may rely on experiences of other jurisdictions to show that its ordinances further the substantial interest in curbing secondary effects. *See Playtime Theatres, Inc.,* 475 U.S. at 50-51.

 Respondents imply that the actual purpose of the ordinances is to eliminate adult entertainment from the City of Bellevue. However, a court should not strike down an otherwise constitutional statute on the assumption that the legislative body had a wrongful purpose. *O'Brien,* 391 U.S. at 383; *McCray v. United States,* 195 U.S. 27, 56, 24 S. Ct. 769, 49 L. Ed. 78 (1904). Therefore, the possibility of a wrongful purpose on the part of the City Council is insufficient reason to strike down a provision with the stated purpose of preventing criminal behavior.

Respondents also argue that applying the four-foot rule to their adult cabarets does not serve the stated purpose of the rule because the City has not proven that these particular cabarets produce the targeted secondary effects. The validity of a regulation, however, depends on its relation to the overall problem a city seeks to correct. *Ward v. Rock Against Racism,* 491 U.S. 781, 801, 109 S. Ct. 2746, 105 L. Ed. 2d 661, *reh'g denied,* 492 U.S. 937 (1989). In *Ward,* a party challenged a requirement that the city's sound technician control amplification equipment for all concerts. The court considered all bands affected by the regulation, rather than just the plaintiff, to judge whether the requirement related to the overall problem of inexperienced technicians and insufficient sound volume. *Id.* In this case, the City relied on evidence that adult cabarets generally produce certain harmful secondary effects. In

order to prevent these secondary effects, the City may regulate all adult cabarets and require Respondents' compliance despite their claims that they do not produce the secondary effects targeted by the regulation.

 As required by the third *O'Brien* factor, Bellevue's interest in curbing the secondary effects of adult entertainment is unrelated to the suppression of free expression. Although the challenged ordinances apply only to adult theaters, as opposed to other kinds of theaters, the Supreme Court has held that the interest in controlling secondary effects justifies different treatment for adult entertainment establishments. *Young v. American Mini Theatres, Inc.*, 427 U.S. 50, 71 n.34, 96 S. Ct. 2440, 49 L. Ed. 2d 310 (plurality opinion) (upholding an ordinance that affected only adult theaters because it had the purpose of preventing urban areas from becoming the focus of crime), *reh'g denied*, 429 U.S. 873 (1976); *Barnes*, 501 U.S. at 586 (Souter, J., concurring); *see also Collier v. Tacoma*, 121 Wn.2d 737, 752, 854 P.2d 1046 (1993) (indicating a willingness to distinguish adult theaters from other kinds of theaters based on the secondary effects of adult entertainment).

The fourth *O'Brien* factor is also satisfied because the distance restriction is no greater than essential to further the interest in preventing public sexual contact. The four-foot rule requires just an arm's length distance between a dancer and patron. Furthermore, it allows dancers to engage in all types of movement, with the exception of pure sexual conduct, in order to convey eroticism.

 However, Respondents argue that the four-foot rule is so restrictive as to deny dancers a reasonable means of earning a living and cause the imminent failure of all adult cabarets in Bellevue. If such a failure was inevitable, then the distance requirement would be unconstitutional. In *Gomillion v. Lightfoot*, 364 U.S. 339, 340-41, 81 S. Ct. 125, 5. L. Ed. 2d 110 (1960), the Supreme Court sustained a complaint which, if true, established that newly drawn municipal boundaries would have the "inev-

itable effect" of depriving a racial group of their constitutional right to vote. The stated purpose of the legislation in *Gomillion* was irrelevant because inevitably its provisions violated a constitutional right. *Id.; see also O'Brien*, 391 U.S. at 385 (finding that the destruction of Selective Service certificates was not necessarily expressive, and thus a statute prohibiting this activity did not inevitably violate a constitutional right). In this case, Respondents presented evidence showing only that financial failure was possible, and thus failed to show an "inevitable effect" such as that in *Gomillion*.

Respondents also contend that the four-foot rule is too restrictive because "the dancers' message would be significantly less well received by the intended audience from four feet away." Reply Br. of Resp't at 20. They argue that customer dissatisfaction will result in lower revenues for dancers, who then will be "unwilling" to pay rent to the cabarets. Even if these predictions prove true, such a result would not necessarily mean that the four-foot rule denies dancers and club owners a reasonable means of earning a living. Decreased opportunity for illegal sexual contact could be one cause of customer dissatisfaction. The instant case also is easily distinguishable from a case cited by Respondents, *United States v. National Treasury Employees Union*, 513 U.S. 454, 115 S. Ct. 1003, 130 L. Ed. 2d 964 (1995), in which the Supreme Court invalidated a regulation prohibiting federal workers from receiving compensation for speaking engagements. By contrast, Bellevue places no restrictions on the amount of payment dancers may receive and, thus, does not effectively foreclose a reasonable means of earning a living.

Our decision upholding the four-foot restriction is in accord with other courts which have upheld more restrictive separation requirements. *See, e.g., Kev, Inc. v. Kitsap County*, 793 F.2d 1053, 1061 (9th Cir. 1986) (upholding a regulation requiring that all dancing in erotic dance studios take place at least 10 feet from patrons); *DLS, Inc., v. City of Chattanooga*, 894 F. Supp. 1140, 1145-46 (E. D.

Tenn. 1995) (upholding a regulation requiring at least six feet between dancers and patrons in order to prevent sexual contact during table and couch dances).

Although Respondents presented evidence that the four-foot rule regulates expression, they presented no evidence that the eight-foot rule for stage dancing affects expression. As a result, the trial court found that proximity is not an instrument of communication for stage dancing, in which the dancers direct their erotic message to the entire audience in the adult cabaret.[8] The judge therefore applied rational basis scrutiny and upheld the regulation.

Because the eight-foot requirement limits only proximity and does not restrict the expressive aspect of stage dancing, the rational basis test is applicable. *See BSA, Inc. v. King County,* 804 F.2d 1104, 1111 (9th Cir. 1986) (upholding a six-foot stage requirement because the plaintiffs presented no evidence that the distance between entertainer and patron was an integral part of the expression). In *O'Day,* this court found that a similar distance requirement did not affect expression because it merely specified the place from which dancers may convey an erotic message. We upheld not only the distance requirement, but also refused to do a time, place or manner analysis because the restriction affected only conduct. *O'Day,* 109 Wn.2d at 810. We similarly find in this case that the eight-foot requirement for stage dancing regulates only conduct, and therefore examine this rule under the rational basis test.

The City performed an experiment demonstrating that a very tall customer could reach a nude stage dancer with a separation of only six feet. As the trial court concluded, the governmental interest in preventing illegal contact is

---

[8]BCC § 5.08.070(A)(1) provides:

No employee or entertainer shall be unclothed or in such less than opaque and complete attire, costume or clothing so as to expose to view any portion of the female breast below the top of the areola or any portion of the pubic region, anus, buttocks, vulva or genitals, except upon a stage at least eighteen inches above the immediate floor level and removed at least eight feet from the nearest member of the public.

a rational basis for extending the minimum distance to eight feet.

## C.

### Lighting Requirement[9]

Respondents argue that the 30 lux requirement regulates the time, place, or manner of expression by virtually eliminating the use of lighting to enhance the dramatic impact of stage dancing. They argue that the requirement restricts expression on the basis of content because it applies only to performances involving nudity or a message of sexual arousal. They also argue that the requirement permits unbridled discretion by the licensing officials because there is no standardized method of measuring compliance.

The trial court found, however, that increasing the light in the nonstage areas allows patrons to see individual dances more clearly. Although the lighting requirement applies only to adult cabarets, it is well established that a city may treat adult cabarets differently from other types of clubs if the regulation targets secondary effects. Furthermore, discretion is limited because the trial court interpreted BCC § 5.08.070(D)(2) as not requiring 30 lux at all points in an adult cabaret. The regulation provides for measurement with a light meter 30 inches from the floor and on 10-foot centers.

 We find that the *O'Brien* test is applicable to the lighting regulation because it affects the manner of expression in adult cabarets. We also find that the regulation withstands scrutiny under that test. The regulation is within the constitutional power of the government to

---

[9]The minimum lighting standard, BCC § 5.08.070(D)(2), reads:

Lighting. Sufficient lighting shall be provided and equally distributed throughout the public areas of the premises so that all objects are plainly visible at all times. A minimum lighting level of 30 lux horizontal measured at 30 inches from the floor on 10-foot centers is hereby established for all areas of the adult cabaret where members of the public are admitted.

protect the health and welfare of its citizens against criminal activity. The regulation furthers the important or substantial governmental interest in providing a level of lighting that would allow officers to detect violations of the ordinance or of criminal statutes. This interest in preventing criminal behavior is unrelated to the suppression of free expression. The incidental restriction on free expression is no greater than essential to further the governmental interest because the lighting requirement is narrowly tailored to the need for visibility. *See World Wide Video, Inc.*, 117 Wn.2d at 392 (upholding a requirement of evenly distributed lighting throughout peep show booths) (citing *Acorn Invs., Inc. v. City of Seattle*, 887 F.2d 219, 223 (9th Cir. 1989)).

## D.

## Closing Hour Provision

■ Although the closing hour provision[10] limits expression during certain hours, we find it is constitutionally valid under *O'Brien*. The City acted within its constitutional power to protect the health and welfare of its citizens by requiring adult cabarets to close from 2 a.m. to 10 a.m. The requirement advances the substantial governmental interest of preventing the flow of patrons from bars, which close at 2 a.m., to adult cabarets. This interest is unrelated to the erotic message conveyed by dancers and the restrictions on First Amendment freedoms is no greater than essential to the furtherance of the city's interest since adult cabarets may operate 16 hours a day, 7 days a week. *See Mitchell v. Commission on Adult Entertainment Establishments*, 10 F.3d 123, 139 (3d Cir. 1993) (upholding a statute establishing closing hours for adult entertainment establishments).

---

[10]BCC § 5.08.070(E) provides that "[i]t is unlawful for any adult cabaret to be operated or otherwise open to the public between the hours of two a.m. and ten a.m."

E.

### Overbreadth of Outdoor Prohibition and Other Challenged Provisions

Respondents raise three claims of overbreadth, and Appellant challenges the trial court's conclusion that one of the provisions is overbroad. First, Respondents claim that the definition of "adult entertainment" contained in BCC § 5.08.010(B) is overbroad because it covers businesses and activities that the City has not shown to produce harmful secondary effects. Br. of Resp't at 45, 47. Second, Respondents claim that BCC § 5.08.070(A)(6) is overbroad because the four-foot rule applies to any performance regardless of whether it is the type that investigations have shown to produce sexual contact. Third, Respondents claim that the prohibition against certain types of sexual conduct in BCC § 5.08.070(A)(5) is overbroad because it covers nonobscene acts. The City appeals the trial court's conclusion that BCC § 5.08.070(B)(2), the "outdoor prohibition," is unconstitutionally overbroad. Br. of Appellant at 8.

■ A statute is overbroad if it sweeps constitutionally-protected expression within its prohibitions. *New York v. Ferber*, 458 U.S. 747, 770, 102 S. Ct. 3348, 73 L. Ed. 2d 1113 (1982). However, an ordinance regulating expressive conduct as opposed to pure speech will be overturned only if the overbreadth is "both real and substantial in relation to the ordinance's plainly legitimate sweep." *City of Seattle v. Webster*, 115 Wn.2d 635, 641, 802 P.2d 1333, 7 A.L.R.5th 1100 (1990) (applying the First Amendment overbreadth doctrine) (quoting *City of Seattle v. Eze*, 111 Wn.2d 22, 31, 759 P.2d 366, 78 A.L.R.4th 1115 (1988)), *cert. denied*, 500 U.S. 908 (1991); *Broadrick v. Oklahoma*, 413 U.S. 601, 615, 93 S. Ct. 2908, 37 L. Ed. 2d 830) (1973)).

Respondents first challenge the definition of "adult entertainment" in BCC § 5.08.010(B).[11] Respondents argue

---

[11]BCC § 5.08.010(B)(1) defines "Adult Entertainment" as "[a]ny exhibition, performance or dance of any type conducted in a premises where such exhibi-

that Bellevue's definition of "adult entertainment" includes businesses that are not "traditional striptease clubs" and therefore have not been shown to produce the secondary effects targeted by Bellevue's ordinances. Br. of Resp't at 45-46. Respondents contemplate businesses that might feature a "Las Vegas style review with some nudity." Reply Br. of Resp't at 17. They also contemplate businesses that might feature a single performance in which a single entertainer exposes certain anatomical areas or depicts sexual activities. Br. of Resp't at 47. Moreover, the definition of "adult entertainment" makes the ordinance applicable to such businesses regardless of whether they regularly feature these types of performances. Respondents rely on *World Wide Video, Inc.*, 117 Wn.2d at 389, in which this court rejected the city's reliance on studies of adult movie theaters and peep shows to justify restrictions affecting businesses with only "take home" merchandise. Br. of Resp't at 50-51.

Here the businesses which Respondents contemplate as falling impermissibly within the ordinance's reach would feature live dancing that includes nudity — the same type of activity studied by Bellevue. Moreover, the theory that a substantial number of businesses feature nude dancing only occasionally or only through a Las Vegas style review is unrealistic considering Respondents' insistence that their dancers rely on table and couch dances for revenues. Thus, any overbreadth is not real or substantial in relation to the ordinance's plainly legitimate application to adult cabarets of the type studied by Bellevue and surrounding jurisdictions.

tion, performance or dance involves a person who is unclothed or in such . . . attire . . . as to expose any portion of the female breast . . . anus, buttocks, vulva or genitals . . ."

BCC § 5.08.010(B)(2) defines "Adult Entertainment" as "[a]ny exhibition, performance or dance of any type conducted in a premises where such exhibition, performance or dance is distinguished or characterized by a predominant emphasis on the depiction . . . of the following sexual activities . . ."

BCC § 5.08.010(B)(3) defines "Adult Entertainment" as "[a]ny exhibition, performance or dance which is intended to sexually stimulate any member of the public and which is conducted on a regular basis or as a substantial part of the premises activity."

 Next, Respondents claim that the four-foot rule in BCC § 5.08.070(A)(6) is overbroad because it requires that all nonstage dancing be performed no less than four feet from "any member of the public." Br. of Resp't at 51. Where possible and appropriate, a court should construe a statute to uphold its constitutionality. *City of Tacoma v. Luvene*, 118 Wn.2d 826, 840, 827 P.2d 1374 (1992). A simple limiting construction can cure the possible overbreadth infirmities of a regulation so as to preserve its constitutionality and serve a city's intention to proscribe only certain conduct. *Soundgarden v. Eikenberry*, 123 Wn.2d 750, 763-64, 871 P.2d 1050 (1994); *State v. Halstien*, 122 Wn.2d 109, 122-23, 857 P.2d 270 (1993). This court's construction of a statute or ordinance becomes as much a part of the legislation as if it were originally written into it. *State v. Regan*, 97 Wn.2d 47, 51-52, 640 P.2d 725 (1982). The provision requiring a distance of four feet for individual dances is not overbroad because the trial court appropriately interpreted the provision as establishing this minimum distance between a dancer and "his or her customer." CP at 185 (DeJa Vu conclusion of law 8); *see Soundgarden*, 123 Wn.2d at 757.

Finally, Respondents challenge BCC § 5.08.070(A)(5),[12] which they argue prohibits nonobscene expression because the dramatic works exception, BCC § 5.08.070(F),[13] is too narrow. The latter provision, however, excepts all conduct which is nonobscene from the prohibition in section

---

[12]BCC § 5.08.070(A)(5) provides: "No employee or entertainer shall perform actual or simulated acts of sexual conduct as defined in this chapter, or any act which constitutes a violation of chapter 7.48A, the Washington Moral Nuisances Statute, or Chapter 10A.88 of the BCC."

[13]BCC § 5.08.070(F) provides:

This chapter shall not be construed to prohibit:

1. Plays, operas, musicals, or other dramatic works that are not obscene;

2. Classes, seminars and lectures which are held for serious scientific or educational purposes and which are not obscene; or

3. Exhibitions, performances, expressions or dances that are not obscene.

*These exemptions shall not apply to the sexual conduct described in RCW 7.48A. 010(2)(b) (ii) and (iii).*

(Emphasis added).

5.08.070(A)(5), and excludes from the exception only the obscene conduct described in RCW 7.48A.010(2)(b).[14] Thus, contrary to Respondents' claim, BCC § 5.08.070(F) is valid because it prohibits only obscene expression.

Turning to Appellant's argument, the City contends that the trial court erred in holding unconstitutional the City's prohibition on any nude performances "or graphic representation thereof" outside of adult cabarets. Br. of Appellant at 8. The purpose of the provision is to assure that minors and other passersby are not subjected to offensive displays. *Id.* The challenged provision, § 5.08.070 (B)(2), provides:

B. *At any adult cabaret*, the following are required:

. . . .

2. *Neither the performance nor* any photograph, drawing, sketch or other pictorial or *graphic representation thereof* displaying any portion of the breasts below the top of the areola or any portion of the pubic hair, buttocks, genitals, and/or anus *may be visible outside of the adult cabaret.*

(Emphasis added).

■ Public nudity receives limited constitutional protection. *City of Seattle v. Buchanan*, 90 Wn.2d 584, 603, 584 P.2d 918 (1978) (upholding an ordinance banning public nudity because the ordinance was directed at conduct rather than the expression of ideas). Courts have recognized the governmental interest in protecting children

[14]RCW 7.48A.010(2) provides:

"Lewd matter" is synonymous with "obscene matter" and means any matter:

(a) Which the average person, applying contemporary community standards, would find, when considered as a whole, appeals to the prurient interest; and

(b) Which explicitly depicts or describes patently offensive representations or descriptions of:

(i) Ultimate sexual acts, normal or perverted, actual or simulated; or

(ii) Masturbation, fellatio, cunnilingus, bestiality, excretory functions, or lewd exhibition of the genitals or genital area; or

(iii) Violent or destructive sexual acts, including but not limited to human or animal mutilation, dismemberment, rape or torture; and

(c) Which, when considered as whole, and in the context in which it is used, lacks serious literary, artistic, political, or scientific value.

from exposure to indecency, psychological abuse, and obscenity. *See Action for Children's Television v. F.C.C.*, 58 F.3d 654 (D.C. Cir. 1995) (en banc) (upholding restrictions intended to protect children from non-obscene but indecent broadcasts); *Bering*, 106 Wn.2d at 241 (finding that the State had a compelling interest in protecting children from the psychological abuse inflicted by picketers' speech); *Soundgarden*, 123 Wn.2d at 758 (finding that the definition of "erotic material" under RCW 9.68.050 is a constitutionally valid definition of obscenity adjusted for minors). States have an interest in the well-being of their youth, and thus the states' power to regulate communicative materials available to children is somewhat broader than their power to regulate materials available to adults. *Video Software Dealers Ass'n v. Webster*, 968 F.2d 684, 688 (8th Cir. 1992) (citing *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 212, 214 n.11, 95 S. Ct. 2268, 45 L. Ed. 2d 125 (1975)).

■ Although the provision here would be overly broad if construed to ban artistic nude images not covered by the dramatic works exception, the City suggests a reasonable constitutional interpretation. Limiting the prohibition to adult cabaret performances or representations of such performances eliminates the possibility of application to artistic works such as nonobscene nude paintings. This interpretation also serves the City's clear intention to protect minors by proscribing only the outdoor performance or pictorial images of adult cabaret entertainment.

### III

### Economic Impact

■ Respondents next contend that the trial court erred in excluding evidence of the ordinance's economic impact. The Supreme Court has held that " '[t]he inquiry for First Amendment purposes is not concerned with economic impact.' " *Playtime Theatres, Inc.*, 475 U.S. at 54 (quoting the concurrence of Powell, J., in *Young*, 427 U.S. at 78). Rather, courts should look only to the ordinance's effect

upon freedom of expression. *Young*, 427 U.S. at 78; *see also Topanga Press, Inc. v. City of Los Angeles*, 989 F.2d 1524, 1528 (9th Cir. 1993), *cert. denied*, 511 U.S. 1030, 114 S. Ct. 1537 (1994).

This court rejected a claim that a six-foot separation during topless table dances would prevent dancers from earning a living. *Bolser v. Washington State Liquor Control Bd.*, 90 Wn.2d 223, 230-31, 580 P.2d 629 (1978) (reaching this decision, however, in the context of the State's broad authority under the Twenty-first Amendment to protect public health, welfare, and morals). The separation was a reasonable method of protecting the public welfare while permitting dancers to practice their occupation. *Id.* However, an ordinance may not eliminate all businesses in existence at the time of its passage. *Walnut Properties, Inc. v. City of Whittier*, 861 F.2d 1102, 1110 (9th Cir. 1988) (declaring unconstitutional an ordinance that effectively denied Walnut Properties a reasonable opportunity to open and operate an adult theater within the city and would force the closure of all existing adult businesses), *cert. denied*, 490 U.S. 1006 (1989).

The trial court appropriately evaluated Respondents' economic evidence in order to determine whether the ordinance infringed upon freedom of expression. The trial court considered Respondents' evidence on economic impact, stating, "[t]he four foot distance will affect the revenue the dancer could expect to make." CP at 201 (Ino Ino, Inc., finding of fact 24). The court also explained that Respondents' evidence was insufficient to show unduly burdensome economic impact: "None of the [Respondents] are excluded from a business or occupation or prevented from charging a fee for services." *Id.* at 215 (conclusion of law 36).

Next, Respondents claim that the trial court erred in refusing to reconsider its decision on the basis of additional evidence of economic impact offered after judgment. Newly discovered evidence must be that which the moving party "could not with reasonable diligence have

discovered and produced at the trial." CR 59(a)(4). The court issued an oral decision on March 31, 1995. On May 3, 1995, Ino Ino, Inc., filed a Motion to Reconsider and Amend Judgment, supported by a declaration by business manager Steve Fueston. The motion and declaration averred that the City's four-foot restriction had resulted in the "dire economic consequences" predicted in trial testimony. CP at 81; see also Report of Proceedings (March 16, 1995) at 159, 168 (a part-owner of Papagayo's and Babes testified that the four-foot rule and 30-lux minimum *might* have a negative impact on his clubs).

Respondents' legal and business decisions caused the extent to which the case was tried without evidence of actual economic impact. They successfully moved to consolidate the preliminary injunction hearing with a trial on the merits. Thus, they chose to go to trial without attempting compliance with the City's new regulations.

In any event, the Fueston declaration fails to make a case for reopening the evidence. Mr. Fueston stated that Ino Ino, Inc., began to comply with the City's regulations after the trial court's oral decision on March 31, 1995. Evidence supporting the motion would have consisted of a decline in revenues from the period of noncompliance in March to the period of compliance in April. However, the Fueston declaration states that Papagayo's actually lost more money in March ($37,077.59) than in April ($35,062.49). Ino Ino, Inc., thus makes no showing that the "new" evidence would have altered the trial court's decision.

## IV

### Motion to Amend Complaint

Ino Ino, Inc., also argues that the trial court abused its discretion by denying leave to file an amended complaint after the trial court had entered its findings, conclusions, and judgment. The amended complaint deletes taking claims that the trial court dismissed with prejudice. The

amended complaint also alleges that the City's "unduly repressive" four-foot distance and lighting requirements violate Respondents' substantive due process rights. Br. of Resp't at 56, 58.

Appellate courts apply an abuse of discretion standard to trial courts' decisions denying leave to amend a complaint after the pleadings have closed. *See* CR 15(a); *Elliot v. Barnes*, 32 Wn. App. 88, 645 P.2d 1136, *review denied*, 97 Wn.2d 1037 (1982). A trial court may consider whether the new claim is futile or untimely. *MacLean v. First N.W. Indus., Inc.*, 96 Wn.2d 338, 345, 635 P.2d 683 (1981); *Doyle v. Planned Parenthood, Inc.*, 31 Wn. App. 126, 131, 639 P.2d 240 (1982) (noting that the motion asserted a meritless claim and was submitted after judgment). A plaintiff who makes a substantive due process claim must plead and prove that the challenged government action is "wholly arbitrary and capricious or irrational, or utterly fails to serve a legitimate purpose." *Robinson v. City of Seattle*, 119 Wn.2d 34, 61, 830 P.2d 318, *cert. denied*, 506 U.S. 1028 (1992).

Ino Ino, Inc.'s new claim is both untimely and futile. Respondent untimely brought its motion after the court had entered a final judgment. Furthermore, evaluation of the free speech claims makes clear that the challenged ordinances are not wholly arbitrary and capricious or irrational. Thus, a substantive due process claim would have been futile. The trial court did not abuse its discretion by denying Ino Ino leave to amend its complaint.

## V
### Attorneys' Fees

Respondents challenge the trial court's decision to award the City attorneys' fees for dissolving the temporary restraining order. Appellant, however, claims that the trial court erroneously limited the award to the amount of the bond. Generally, Washington courts refuse to award attorneys' fees incurred during litigation in the

absence of a contract, statute, or recognized ground of equity. *Hsu Ying Li v. Tang*, 87 Wn.2d 796, 797-98, 557 P.2d 342 (1976). On equitable grounds, a party may recover attorneys' fees reasonably incurred in dissolving a wrongfully issued injunction or restraining order. *Alderwood Assocs. v. Washington Envtl. Council*, 96 Wn.2d 230, 247, 635 P.2d 108 (1981); *Cecil v. Dominy*, 69 Wn.2d 289, 291-92, 418 P.2d 233 (1966). A temporary restraining order is "wrongful" if it is dissolved at the conclusion of a full hearing. *Id.* at 293-94.

The purpose of the equitable rule permitting recovery for dissolving a preliminary injunction or restraining order is to deter plaintiffs from seeking relief prior to a trial on the merits. *White v. Wilhelm*, 34 Wn. App. 763, 773-74, 665 P.2d 407, *review denied*, 100 Wn.2d 1025 (1983). The award for attorneys' fees may exceed the amount of the bond required by Civil Rule 65(c)[15] because the award is based on equity rather than the bond statute. *Seattle Firefighters No. 27 v. Hollister*, 48 Wn. App. 129, 139, 737 P.2d 1302, *review denied*, 108 Wn.2d 1033 (1987); *Hsu Ying Li*, 87 Wn.2d at 799. The amount of a reasonable attorneys' fee is within the trial court's discretion.

In this case, the trial court granted the City's request for attorneys' fees, but limited the award to $5,000 — the amount of the bond that the court required of Respondents.[16] *See* CP at 361 (Ino Ino, Inc.) (awarding the City of Bellevue $3,333.33 in attorneys' fees); CP at 231 (Deja Vu)

---

[15]CR 65(c) provides in part: "no restraining order or preliminary injunction shall issue except upon the giving of security by the applicant, in such sum as the court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained."

[16]Pursuant to CR 65, the trial court premised the temporary restraining order on the posting of a bond for $5,000. Respondents argue that the order never took effect because they did not post the bond amount. Therefore, they argue, none of the City's attorneys' fees were incurred in dissolving the temporary restraining order. However, in *White v. Wilhelm*, 34 Wn. App. 763, 665 P.2d 407, *review denied*, 100 Wn.2d 1025 (1983), the court granted fees incurred in an attempt to dissolve a temporary restraining order despite the plaintiff's failure to post bond. Similarly, in this case Respondents may not benefit from their neglect in posting the bond required by the trial court.

(awarding the City of Bellevue $1,666.67 in attorneys' fees). The city presented evidence that it incurred $34,000 in attorneys' fees for dissolving the temporary restraining order. Yet the trial court gave no explanation for awarding only $5,000. We therefore remand for a determination of attorneys' fees.

The City also argues that it is entitled to attorneys' fees on appeal. However, the equitable rule allowing attorneys' fees for dissolving a temporary restraining order does not entitle a successful defendant to recover all fees incurred in defending against injunctive relief. *Ritchie v. Markley,* 23 Wn. App. 569, 575, 597 P.2d 449 (1979), overruled on other grounds in *Cowiche Canyon Conservancy v. Bosley,* 118 Wn.2d 801, 823, 828 P.2d 549 (1992). A defendant may recover attorneys' fees up to the date on which a wrongfully issued restraining order is dissolved. *Id.* (citing *Talbot v. Gray,* 11 Wn. App. 807, 812, 525 P.2d 801 (1974), *review denied,* 85 Wn.2d 1001 (1975)); *Kelly v. Schorzman,* 3 Wn. App. 908, 914, 478 P.2d 769 (1970); *Berne v. Maxham,* 82 Wash. 235, 144 P. 23 (1914)).

Accordingly, in prior cases we have allowed recovery for attorneys' fees incurred at the appellate level only when appeal was necessary to dissolve a currently effective temporary restraining order. *See Alderwood Assocs. v. Washington Envtl. Council,* 96 Wn.2d 230, 247, 635 P.2d 108 (1981) (allowing fees on appeal because the wrongfully issued temporary restraining order had not been dissolved previously by trial, motion, or hearing); *Seattle Firefighters No. 27,* 48 Wn. App. at 138 (allowing fees on appeal because the defendant incurred the fees in order to dissolve temporary injunctions which were still effective prior to appeal); *Federal Way Family Physicians, Inc. v. Tacoma Stands Up For Life,* 106 Wn.2d 261, 268-69, 721 P.2d 946 (1986) (allowing fees incurred on appeal to dissolve a temporary restraining order that was still effective prior to appeal, conditioned on the trial court's deci-

sion to deny a permanent injunction after a hearing on the merits).

In contrast to the cases cited above, the trial court in this case dissolved the temporary restraining order prior to appeal after a hearing on the merits. Therefore, the purpose of discouraging parties from seeking relief prior to a hearing on the merits is inapplicable on this appeal. The City thus may not recover attorneys' fees incurred on appeal despite their success in defending against permanent injunctive relief at this level.

■■■ Respondents also seek attorneys' fees, arguing that because they brought their claims under 42 U.S.C. § 1983 (1994)[17] they are entitled to fees pursuant to 42 U.S.C. § 1988 (1994). In a claim based on § 1983, the court "in its discretion, may allow the prevailing party . . . a reasonable attorney's fee as part of the costs." 42 U.S.C. § 1988 (1994). A plaintiff "prevails" when actual relief on the merits of his claim materially alters the legal relationship between the parties by modifying the defendant's behavior in a way that directly benefits the plaintiff. *Farrar v. Hobby*, 506 U.S. 103, 111-13, 113 S. Ct. 566, 121 L. Ed. 2d 494 (1992) (holding that even a plaintiff who is awarded only nominal relief is a "prevailing party" under this definition).

In this case, Respondents meet the low threshold for prevailing party status because they succeed on their prior restraint challenge to the 14-day delay in issuing managers' licenses. However, 42 U.S.C. § 1988 provides for an award only if a party's rights under the federal constitu-

---

[17]42 U.S.C. Section 1983 (1994) provides in pertinent part:

Every person who, under color of any . . . ordinance . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

tion or federal law are violated. *Snohomish County v. Anderson*, 124 Wn. 2d 834, 881 P.2d 240 (1994).[18]

## CONCLUSION

We affirm the trial court's decision that the requirements on distance, lighting, closing hours, and disclosure of personal information are constitutional. We uphold the trial court's evaluation of Respondents' evidence on economic impact, the court's refusal to admit new evidence after judgment was rendered, and the court's denial of Ino Ino, Inc.'s Motion for Leave to Amend its Complaint.

We reverse the trial court's decision with respect to the 14-day processing period for a manager's license. The 14-day delay, with no issuance of a temporary license for managers, is an unconstitutional prior restraint. We also reverse the trial court's decision invalidating the outdoor prohibition. This provision is constitutional when interpreted to prohibit only the outdoor performance of adult cabaret entertainment or visual images of such entertainment.

With respect to attorneys' fees incurred prior to the trial court's dissolution of the temporary restraining order, we uphold the trial court's decision granting an award to the City, but remand for a determination of the amount.

DOLLIVER, SMITH, and GUY, JJ., concur.

ALEXANDER, J. (concurring in part, dissenting in part) — I concur with the majority opinion in every respect but one. I disagree with its conclusion that the City of Belle-

---

[18]This case is distinguishable from *JJR Inc.* where this court awarded attorney fees although we found only a violation of the state constitution. We observed, however, that license revocation or suspension has been recognized by federal courts as a prior restraint. In addition, our conclusion in *JJR Inc.* was consistent with *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 110 S. Ct. 596, 107 L. Ed. 2d 603 (1990). In contrast, it is clear that the federal constitution is not violated by a brief delay in license approval. *World Wide Video Inc.*, 117 Wn.2d at 392-94; *Kev, Inc.*, 793 F.2d at 1060 n.6.

vue is entitled to an award of attorney fees for dissolving what was held to be a wrongfully issued temporary restraining order.

My disagreement with the majority stems from the fact that no effective temporary restraining order was in effect that called for dissolution. The putative order that the City sought to dissolve was entered by the trial court on February 24, 1995. It contained the following provision: "This order shall become effective on the posting by plaintiffs of a bond in the amount of $5,000.00[.]" Clerk's Papers at 56. The record shows that the required bond was never posted. As a consequence, the temporary restraining order never came into being. That being the case, the City should not be awarded fees for its efforts to seek its dissolution.

Even assuming that the temporary restraining order was somehow in effect, notwithstanding the respondents' failure to post the $5,000 bond, the City could have moved to quash it for the respondents' failure to post the required bond. If the City had done so, the trial court would have had no alternative but to grant the motion.[19] In that event, the fees the City would have been entitled to receive for its efforts to quash the bond would have been far less than what it seeks here. The City should not benefit because it ignored the respondents' failure to fulfill a condition precedent to making the trial court's order effective.

The plain fact is that the City is not entitled to an award of fees for resisting the respondents' efforts to have the Bellevue ordinance declared unconstitutional. Perhaps aware of the obstacles it faced in a direct effort to recover fees for defending the constitutionality of its ordinance, the City ingeniously sought fees in an indirect way for its efforts in dissolving the ineffective temporary restraining

---

[19]CR 65(c) provides:

"(c) Security. Except as otherwise provided by statute, no restraining order or preliminary injunction shall issue except upon the giving of security by the applicant, in such sum as the court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained."

order. In my judgment, the City is not entitled to fees under that theory or any other. I, therefore, dissent in part.

TALMADGE, J. (concurring in part/dissenting in part) — I agree with the majority's analysis of all of the issues in the case except attorney fees for the dissolution of the temporary restraining order. The majority is correct in concluding that the fees are not limited to the amount of the bond required by CR 65(c). I agree with the majority that 42 U.S.C. § 1988 (1994) does not preempt an award of fees to the City of Bellevue (Bellevue) under state law and that the respondents were not a prevailing party for purposes of the federal statute. But I believe Bellevue is entitled to attorney fees on appeal under the dissolution of a wrongful injunction exception to the American rule on attorney fees. RAP 18.1(a).

I disagree with the majority's narrow interpretation of the dissolution of the wrongful injunction exception to the American rule. In *Cecil v. Dominy*, 69 Wn.2d 289, 291-92, 418 P.2d 233 (1966), we stated a broader formulation of the exception:

> Because the trial on the merits had for its sole purpose a determination of whether the injunction should stand or fall, and was the only procedure then available to the party enjoined to bring about dissolution of the temporary injunction, the case comes within the rule that a reasonable attorney's fee reasonably incurred in procuring the dissolution of an injunction wrongfully issued represents damages suffered from the injunction.

*See also Alderwood Assocs. v. Washington Envtl. Council*, 96 Wn.2d 230, 635 P.2d 108 (1981). The entire thrust of the respondents' cross-appeal was to restore the original injunction. To the extent the respondents maintain in play the question of whether an injunction should be is-

sued, Bellevue is entitled to its expenses incurred for resisting the wrongful injunction respondents sought throughout this case.

In the cases cited by the majority in its opinion at page 144, attorney fees were awarded at trial and on appeal where a party successfully *reversed* a wrongful injunction on appeal. There is a certain illogic to the proposition that a party is entitled to its attorney fees at trial under the wrongful injunction dissolution exception to the American rule in removing the wrongful injunctive order, yet is denied its fees on appeal defending the trial order that dissolved the wrongful injunction. Our policy on the awarding of fees and costs on appeal should more accurately reflect the realities of litigation.

To the extent a party persists in pursuing injunctive relief, the opposing party who successfully dissolves an injunction or successfully defends against the restoration of a wrongfully issued injunction on appeal should be entitled to its reasonable attorney fees.

DURHAM, C.J., concurs with TALMADGE, J.

SANDERS, J. (dissenting) — The length of the majority opinion as well as my dissent demonstrates something is amiss.

Our constitution mandates, in unequivocal language, "[e]very person may freely speak, write and publish on all subjects, being responsible for the abuse of that right." WASH. CONST. art. I, § 5. Our canon for constitutional construction requires words be given their ordinary meaning. *Westerman v. Cary,* 125 Wn.2d 277, 288, 892 P.2d 1067 (1994). We had better follow our constitutional text than confuse it beyond recognition with additions, deletions, nuances, complexities and rules of wholly judicial invention. But such is the corner into which our prior decisions have painted us.

But no matter the length and complexity of our analysis here today, two simple questions must be answered: (1) is

nude dancing "speech," and, if so, (2) does the subject ordinance in any way limit its exercise. I answer: "Yes, yes." A third question involving reasonable attorney fees, not so simple but very important, is answered later.

## I.

### Nude Dancing Is Speech

The majority concludes the form of expression at issue in this case (nude dancing) does not warrant the full protections of Washington Constitution article I, section 5, basing this assertion ostensibly on our decision in *JJR Inc. v. City of Seattle,* 126 Wn.2d 1, 8-9, 891 P.2d 720 (1995). But there we held "[n]ude dancing has expressive value requiring constitutional protection . . . ." *Id.* While we noted in that case that nude dancing performed at clubs "clings to the edge of protected expression," we nevertheless concluded it clings to the protected side of the edge. *Id.* at 9. Under this constitutional clause, an inch is as good as a mile. Either the expression is protected speech or it is not. While there may have been a reasonable dispute as to whether nude dancing is the constitutional equivalent of the Gettysburg Address, prior decisions from this court essentially hold nude dancing speaks louder than words. *See also O'Day v. King County,* 109 Wn.2d 796, 803, 749 P.2d 142 (1988) ("[A]rticle 1, section 5 . . . protects nude expression, but not nude conduct.").

## II.

### Free Speech Is Impaired

Our constitution does not set gradations of protected speech nor should the court judicially amend it to do so, especially when *all* speech is protected on "all subjects." CONST. art. I, § 5. Gradations based on content reflect little more than individual preferences toward the types of speech the State seeks to regulate.[20] If we do not want the constitution to mean what it says, we had better amend it than corrupt its text through strained interpretations.

---

[20]As Judge Posner said:

Although our constitutional provision is broader than its federal counterpart, much written about the First Amendment addresses some of the principles common to both. I will therefore use some federal case law to put our state issue in context.

> Under our Constitution, free speech is not a right that is given only to be so circumscribed that it exists in principle but not in fact. Freedom of expression would not truly exist if the right could be exercised only in an area that a benevolent government has provided as a safe haven for crackpots. The Constitution says that Congress (and the States) may not abridge the right to free speech. This provision means what it says. We properly read it to permit reasonable regulation of speech-connected activities in carefully restricted circumstances. But we do not confine the permissible exercise of First Amendment rights to a telephone booth or the four corners of a pamphlet, or to supervised and ordained discussion in a school classroom.

*Tinker v. Des Moines Indep. Community Sch. Dist.,* 393 U.S. 503, 513, 89 S. Ct. 733, 740, 21 L. Ed. 2d 731 (1969). The right of free expression "ranks among the most important of our constitutional rights [; thus] we must recognize that the precious right of free speech requires

---

The true reason I think for wanting to exclude striptease dancing from the protection of the First Amendment is not any of the lawyers' classification games . . . . It is a feeling that the proposition, "the First Amendment forbids the State of Indiana to require striptease dancers to cover their nipples," is ridiculous. It strikes judges as ridiculous in part because most of us are either middle-aged or elderly men, in part because we tend to be snooty about popular culture, in part because as public officials we have a natural tendency to think political expression more important than artistic expression, in part because we are Americans—which means that we have been raised in a culture in which puritanism, philistinism, and promiscuity are complexly and often incongruously interwoven—and in part because like all lawyers we are formalists who believe deep down that the words in statutes and the Constitutions mean what they say, and a striptease is not a speech. But the element of the ridiculous is not all on one side. Censorship of erotica is pretty ridiculous too. What kind of people make a career of checking to see whether the covering of a woman's nipples is fully opaque . . . ?

*Miller v. Civil City of South Bend,* 904 F.2d 1081, 1099 (7th Cir. 1990) (Posner, J., concurring), *rev'd sub nom. by Barnes v. Glen Theatre, Inc.,* 501 U.S. 560, 111 S. Ct. 2456, 115 L. Ed. 2d 504 (1991).

protection even when the speech is personally obnoxious." *Russo v. Central Sch. Dist. No. 1,* 469 F.2d 623, 633-34 (2d Cir. 1972), *cert. denied,* 411 U.S. 932, 93 S. Ct. 1899, 36 L. Ed. 2d 391 (1973). In the federal context, with its less expansive guarantee of free speech, the Ninth Circuit has recognized that "the degree of protection the first amendment affords speech does not vary with the social value ascribed to that speech by the courts." *Kev, Inc. v. Kitsap County,* 793 F.2d 1053, 1058 (9th Cir. 1986).

Recognizing the dancing at issue here is protected expression, we must ask what, if any, restrictions the government may constitutionally impose. The constitutional text would permit none; however, case law, both state and federal, makes the text all but unrecognizable in practical application.

Under the federal standard, a time, place, and manner restriction may be imposed if it furthers only an *important* or *substantial* governmental interest unrelated to free expression, and the restriction goes no further than to promote that interest only. *Barnes v. Glen Theatre, Inc.,* 501 U.S. 560, 566, 111 S. Ct. 2456, 115 L. Ed. 2d 504 (1991). Such is the test used here by the trial court (Deja Vu-Bellevue Clerk's Papers (CP) 186-87, conclusions of law 9 and 10) and adopted by the majority (Majority at 118). But all of the restrictive provisions at issue here are, at the least, regulations on the time, place, and manner of nude dancing (assuming they are not prior restraints as well).

The majority, having decided that nude or seminude erotic dancing is little more than a poor relative of other forms of expression, concludes that a more permissive (federal standard) analysis is all that our state law requires. But I see no basis for this approach under our state constitution or our case law because the state text is completely different from the federal. The federal cases cited by the majority were decided long after the state constitution was adopted and, therefore, obviously played no part whatsoever in the original understanding of what our state provision means. Moreover, prior cases decided

by our court are on point and contrary to the federal standard.

Our court has held article I, section 5 of our state constitution permits the State to impose time, place, and manner restrictions "on protected expression . . . but only if [the restrictions] (1) are content neutral, (2) are narrowly tailored to serve a *compelling* state interest, and (3) leave open ample alternative channels of communication." *O'Day v. King County,* 109 Wn.2d at 808-09 (emphasis added); *Bering v. Share,* 106 Wn.2d 212, 234, 721 P.2d 918 (1986) ("[R]estrictions on speech can be imposed consistent with CONST. art. I, § 5 only upon showing a compelling State interest."); *Collier v. City of Tacoma,* 121 Wn.2d 737, 753-54, 854 P.2d 1046 (1993) ("Tacoma must prove that its ordinances, taken together, are narrowly drawn to serve a compelling state interest.").[21]

Bellevue's ordinance fails not just one but all three elements required by *O'Day,* 109 Wn.2d at 808-09. Moreover its divergence from the constitutional standard stated in the original text is manifest.

## A. Content Neutrality

*Collier,* 121 Wn.2d at 752, held time, place and manner restrictions that are viewpoint neutral, but subject matter based, are "particularly problematic." We held that such restrictions are permissible only as long as "they are narrowly tailored to serve a *compelling* state interest and

---

[21]Cases cited by the majority to the contrary are easily distinguished: *City of Seattle v. Huff,* 111 Wn.2d 923, 926, 767 P.2d 572 (1989) addressed harassing or threatening speech in a nonpublic forum, but did not concern time, place, and manner restrictions on protected means of expression. *State v. Reece,* 110 Wn.2d 766, 781, 757 P.2d 947 (1988), *cert. denied,* 493 U.S. 812, 110 S. Ct. 59, 107 L. Ed. 2d 26 (1989) addressed obscenity, a nonprotected form of expression. *National Fed'n of Retired Persons v. Insurance Comm'r,* 120 Wn.2d 101, 119, 838 P.2d 680 (1992) addressed commercial speech, an area of free speech law the United States Supreme Court has arguably seen fit to segregate from all other forms of speech for special treatment. The reasoning in *National Fed'n of Retired Persons* applies solely to commercial speech. *Richmond v. Thompson,* 130 Wn.2d 368, 382, 922 P.2d 1343 (1996) concerned false and defamatory statements, a form of speech traditionally actionable at common law, and thus implicitly beyond the scope of constitutionally protected free speech.

leave open ample alternative channels of communication."
*Id.* at 753. We recognized that a censorial justification, i.e.,
one adopted because of a disagreement with the message
that a particular speech conveys, will often not be apparent from the face of the legislation and not be supported
by a governmental justification unrelated to the suppression of speech or ideas. *Id.* (citing *Burson v. Freeman,* 504
U.S. 191, 212, 112 S. Ct. 1846, 119 L. Ed. 2d 5 (1992)
(Kennedy, J., concurring)). A showing of improper legislative intent, therefore, is usually "practically impossible to
make." *Collier,* 121 Wn.2d at 751.

Here Bellevue claims the provisions at issue are
designed to ostensibly curb public sexual contact and
prostitution, remove the secondary effects of sexually
oriented businesses, and facilitate law enforcement officers' ability to detect touching between customers and
performers. These claims are of the type we rejected in
*Collier* as too subjective to be determinative. The provisions here facially regulate a specific subject matter—
sexually oriented dance—but, to survive constitutional
scrutiny, these subject matter restrictions must be narrowly tailored to serve a compelling state interest. *Collier,*
121 Wn.2d at 753. These restrictions are clearly not so
tailored. Bellevue's ordinance fails the content neutrality
test.

### B. Compelling State Interest

Our precedent holds time, place, and manner restrictions on expressive activity are unconstitutional unless
the State can demonstrate such laws are necessary to
promote a *compelling* governmental interest. *O'Day,* 109
Wn.2d at 808; *Bering,* 106 Wn.2d at 234; and *Collier,* 121
Wn.2d at 753.[22] However, the trial court found only
"substantial" or "important" interests, not "compelling"

---

[22]By contrast, as noted above, the cases upon which the majority bases its decision are federal cases arising under the First Amendment, *see* Majority at 127
and 128 (citing *United States v. O'Brien,* 391 U.S. 367, 377, 88 S. Ct. 1673, 20 L.
Ed. 2d 672 (1968); *Barnes v. Glen Theatre, Inc.,* 501 U.S. 560, 565, 111 S. Ct.

ones. (Deja Vu-Bellevue CP 180-81, 186-87, findings of fact 31-34, 36, conclusions of law 9 and 10) ("The City's adult cabaret ordinances are designed to serve substantial governmental interests."). Unfortunately the majority has only perpetuated the error. Since a *compelling* interest was neither found nor concluded by the trial court the regulations facially fail the compelling interest test.

## C. Alternative Channels of Communication

The third and final element of our state constitutional test "requires that a time, place, and manner restriction leave open ample alternative channels for communication." *Collier,* 121 Wn.2d at 759. The issue is not whether these dancers can find another job (Majority at 140), it is whether this form of communication will be "regulated" out of existence by Bellevue's ordinance.

In Bellevue the subject ordinances have effectively shut down adult cabarets. The rigid proximity and lighting requirements take the fun out of this entertainment to the extent it is no longer commercially viable.[23]

The majority rejects the argument that the trial court

2456, 115 L. Ed. 2d 504 (1991) (plurality opinion)), despite the fact that the majority is ostensibly analyzing this ordinance under our state constitution.

[23] Perhaps . . . the striptease makes so little contribution to the marketplace of ideas that it can be suppressed even though it is an expressive activity formally akin to the highest forms of art. But here we risk being misled by metaphor. "Marketplace of ideas," useful short-hand though it is for the domain of the First Amendment, leaves out not only nude dancing but also the greater part of art, as well as much of politics, of journalism, of education, of philosophy, of law, and in short of nonscientific discourse generally, for such discourse is heavily rhetorical, emotive. To observe that ordinances forbidding nude dancing in bars "do not prohibit an exchange of ideas which might tend to bring about political or social change," *Yauch v. State,* 109 Ariz. 576, 579, 514 P.2d 709, 712 (1973), or that "it is difficult to conceive of ideas entitled to First Amendment protection which can be solely—or even best—expressed by baring the anus or genitals," *Kew v. Senter,* 416 F. Supp. 1101, 1105 (N.D. Tex. 1976), is correct; it just misses the point. Art and popular entertainment are not awkward or failed attempts to communicate ideas, and the protection of the First Amendment is not limited to ideas.

*Miller v. Civil City of South Bend,* 904 F.2d 1081, 1097-98 (7th Cir. 1990) (Posner, J., concurring), *rev'd sub nom. by Barnes v. Glen Theatre, Inc.,* 501 U.S. 560, 111 S. Ct. 2456, 115 L. Ed. 2d 504 (1991).

erred when it excluded evidence of the ordinance's adverse impact on the economy. But economic impact is the most direct measure of a value placed on an activity by the paying public. If this ordinance did not have an adverse economic impact I am sure the clubs and dancers would not be here. They are the best judges of what is good for their business—not the government or this court.

Destruction of economic viability is the consequence of governmental regulation which first destroys the *value* of the expression. Under our state constitutional analysis such evidence is extremely pertinent to the viability of a restriction on free speech in the sense of providing alternatives. Implicit in a determination as to whether ample alternative channels of communication exist is whether such alternatives are *practically* available. *Collier,* 121 Wn.2d at 760. "Alternatives are not 'alternatives' if they are far from satisfactory." *Id.* If the business venue which these performers use to provide entertainment goes out of business because of restrictive ordinances, such as those in question, and no satisfactory alternative method for this type of communication is available, this entertainment will simply not be available to the public. Driving this kind of entertainment to extinction seems to be the real goal of these ordinances, although they are dressed up to appear to only regulate.[24]

The United States Supreme Court has recognized the role financial incentives play in certain forms of speech when, absent these incentives, there would be no financial reason for the speaker to convey his or her message. In *United States v. National Treasury Employees Union,* 513 U.S. 454, 115 S. Ct. 1003, 1014, 130 L. Ed. 2d 964 (1995), the Court found a ban on honoraria received by federal employees imposed a significant burden on expressive

---

[24]*See* testimony of Bob Wyrich, Representative of Washington Together Against Pornography ("Mr. Wyrich urged the [City] Council to retain the four-foot rule regarding table dancing and *indicated that adult entertainment establishments will go out of business if the existing regulations are strictly enforced."*) (emphasis added). Ex. 32 (City of Bellevue City Council, Summ. of Minutes of Regular Session (Sept. 6, 1994)).

activity because the lack of compensation forced the employees "to curtail their expression if they wish[ed] to continue working for the Government." *Id.* at 1014. Likewise in *Simon & Schuster, Inc. v. New York Crime Victims Bd.,* 502 U.S. 105, 115, 112 S. Ct. 501, 508, 116 L. Ed. 2d 476 (1991) the Court invalidated New York's "Son of Sam" law, which confiscated the proceeds from the sale of a book by a felon as violative of the First Amendment. There the Court noted, "[a] statute is presumptively inconsistent with the First Amendment if it imposes a financial burden on speakers because of the content of their speech." *Id.* at 115.

The ordinance at issue here was directed at only one type of speech, and it restricted the economic viability of adult cabarets so effectively that it drove all adult cabarets in Bellevue out of business and caused others not to open at all. The government's ability to impose such financial burdens on speech "raises the specter that the government may effectively drive certain ideas or viewpoints from the marketplace." *Id.*[25] "It should be remembered that the pamphlets of Thomas Paine were not distributed free of charge." *Murdock v. Commonwealth of Pa.*, 319 U.S. 105, 111, 63 S. Ct. 870, 874, 87 L. Ed. 1292, 146 A.L.R. 81 (1943). Nor could a free press survive if its publications could not be sold to the public. The ordinance therefore also fails the third and final test for constitutional validity enunciated in *Collier.*

### III.

#### Attorney Fees

An appropriate award of reasonable attorney fees in a case such as this is critical. An award against private par-

---

[25]The recent communist government in Nicaragua denied newsprint to newspapers which did not toe the communist line. JOHN SPICER NICHOLS, THE MEDIA, IN NICARAGUA, THE FIRST FIVE YEARS 183, 186 (Thomas W. Walker ed., 1985) (commenting how, with the exception of "a brief thaw in late 1983," *La Presna*, the key opposition newspaper, was continually denied access to newsprint during the first five years of Sandinista rule). Freedom of economic activity is often a predicate to the exercise of other liberties.

ties can cripple those who would defend their liberties. An award for the private parties may encourage them to resist, and thus vindicate the most important public interest of all, protection of our constitutional rights.

The trial court awarded reasonable attorney fees to Bellevue, but limited the fees to $5,000, the amount of the bond the court had required the dancers to post. The majority remands this issue to the trial court for a new award.

But the trial court should not have awarded *any* fees to Bellevue because this case was initiated by the dancers under 42 U.S.C. §§ 1983 and 1988, which preempts any state law permitting recovery of attorney fees by prevailing defendants.

State law is preempted by federal law when there is an actual conflict between the two so that compliance with both laws is physically impossible, or when a state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress. *Inlandboatmen's Union v. Department of Transp.,* 119 Wn.2d 697, 702, 836 P.2d 823 (1992). Under federal law, prevailing defendants in a civil rights action are not entitled to attorney fees unless the claim is frivolous, unreasonable, or without foundation. *Vernon v. City of Los Angeles,* 27 F.3d 1385, 1402 (9th Cir.), *cert. denied,* 513 U.S. 1000 (1994). The purpose of § 1988 is to ensure effective access to the judicial process for persons with civil rights grievances. *Hensley v. Eckerhart,* 461 U.S. 424, 429, 103 S. Ct. 1933, 1937, 76 L. Ed. 2d 40 (1983).[26]

In *Varney v. O'Brien,* 147 Mich. App. 397, 383 N.W.2d

---

[26] In enacting § 1988, Congress rejected the traditional assumption that private choices whether to litigate, compromise, or forgo a potential claim will yield a socially desirable level of enforcement as far as the enumerated civil rights statutes are concerned.

"All of these civil rights laws depend heavily upon private enforcement, and fee awards have proved an essential remedy if private citizens are to have a meaningful opportunity to vindicate the important Congressional policies which these laws contain.

"In many cases arising under our civil rights laws, the citizen who must sue to enforce the law has little or no money with which to hire a lawyer.

213, 217 (1985), government defendants in a § 1983 suit claimed they were entitled to § 1988 attorney fees because the civil rights plaintiff had rejected a mediation award. Under Michigan law, the plaintiff was therefore required to pay the actual costs of litigation. That plaintiff succeeded on only one of four claims against defendants, and even then was awarded damages of only $1.00. 383 N.W.2d at 217. The court classified the issue as "the interplay between a federal statute which awards this plaintiff attorney fees and a local court rule which awards them to the defendants." *Id.* It concluded

> the effectiveness of 42 U.S.C. § 1988 would be undermined if the rejection of a mediation award that turned out to be more favorable than the judgment the plaintiff eventually received prevented the plaintiff from getting an award of attorney fees . . . . [B]ecause Congress through 42 U.S.C. § 1988 has expressed a desire to encourage private enforcement of civil rights, we conclude that the local court rule upon which defendants rely has been preempted and, therefore, defendants are not entitled to recover attorney fees.

*Id.* at 217-18.

Likewise, in *East-Bibb Twiggs Neighborhood Ass'n v. Macon-Bibb Planning & Zoning Comm'n,* 674 F. Supp. 1475, 1477 (M.D. Ga. 1987), *aff'd,* 888 F.2d 1576 (11th Cir. 1989), the federal district court dismissed a defendant's counterclaim for abusive litigation based on state law in a federal civil rights action. The court noted that if state law counterclaims of abusive litigation were allowed to be asserted in federal causes of action, they would have a "tremendous 'chilling-effect' on the assertion of these federally created rights." 674 F. Supp. at 1477. The court concluded that the defendant's state law counterclaim did not state a cause of action "because the underlying dispute arises

---

If private citizens are to be able to assert their civil rights, and if those who violate the Nation's fundamental laws are not to proceed with impunity, then citizens must recover what it costs them to vindicate these rights in court."

*Hensley,* 461 U.S. at 444-45 (Brennan, J., concurring in part and dissenting in part) (footnote omitted) (quoting S. Rep. No. 94-1011, Report 2 (1976)).

out of 42 U.S.C. § 1983. 42 U.S.C. § 1988 and Rule 11 provide defendant . . . with the exclusive remedy for abusive litigation . . . ." *Id.*

In *Birenbaum v. Dawson,* No. 95-CA-0424-MR, 1996 WL 531741 (Ky. Ct. App. Sept. 20, 1996), the plaintiff moved for attorney fees after successfully pursuing judgment under the federal civil rights laws against members of the state Board of Medical Licensure. The board contended that it had absolute immunity from any forms of monetary liability pursuant to Kentucky statutory law. The court stated "Notwithstanding the language of these statutes, it is clear that § 1988, as a federal enactment, preempts any inconsistent state statute, rule, or common law doctrine under the Supremacy Clause, Article VI, clause 2, of the United States Constitution, and therefore controls the disposition of the attorney fees question." *Id.* at *4; see also Collins v. Thomas,* 649 F.2d 1203, 1205-06 (5th Cir. 1981) (holding that § 1988 prevailed over a Texas statute forbidding enforcement of judgments against counties), *cert. denied,* 456 U.S. 936, 102 S. Ct. 1992, 72 L. Ed. 2d 455 (1982); *Gates v. Collier,* 616 F.2d 1268, 1270-71 (5th Cir. 1980) (holding that a Mississippi statute that prohibited satisfaction of judgments against the State in absence of legislative authorization was trumped by § 1988).

If we apply these considerations to the current case, Bellevue, even as a prevailing defendant, is entitled to no reasonable attorney fees under the state common-law rule upon which the majority relies because it is preempted by federal law. *See Vernon,* 27 F.3d at 1402. Nor can Bellevue recover under § 1988 because the dancers' claims in this case were not frivolous, unreasonable, or without foundation. *See id.*

Because the dancers did not prevail on their *federal* claims on appeal, the majority also refuses to award attorney fees to the clubs under § 1988, even though the clubs have met "the low threshold for prevailing party status" by successfully appealing a related state law claim concerning the 14-day delay in issuing a manager's license.

The majority again runs afoul of the purpose of § 1988 as well as applicable United States Supreme Court precedent.

In *Maher v. Gagne,* 448 U.S. 122, 132 n.15, 100 S. Ct. 2570, 65 L. Ed. 2d 653 (1980), the Supreme Court held that a plaintiff who had prevailed on a claim not specifically covered by § 1988 may still be entitled to attorney fees under the act: "The legislative history makes it clear that Congress intended fees to be awarded where a pendent constitutional claim is involved, even if the . . . claim on which the plaintiff prevailed is one for which fees cannot be awarded under the Act." 100 S. Ct. at 2576 n.15. Federal courts will consider a plaintiff to have prevailed on the merits for the purpose of the recovery of fees when the plaintiff prevails on a state law question if the plaintiff's civil rights claim was substantial, and the successful court claim arose from the same nucleus of facts. *Id.* (citing H. R. Rep. No. 94-1558, at 4 n.7 (1976)); *see also Exeter-West Greenwich Reg'l Sch. Dist.,* 788 F.2d 47, 50-51 (1st Cir. 1986) (noting victory in a civil rights suit is typically a practical, rather than a strictly legal matter). Here, the clubs' claims were undeniably substantial, and their state constitutional claim arose from the same facts upon which the federal claim was brought. The clubs, not Bellevue, should therefore recover their reasonable attorney fees under § 1988 because they meet the "prevailing party" standard. *See also Morales v. City of San Rafael,* 96 F.3d 359, 363 (9th Cir. 1996) (prevailing plaintiff is entitled to remand for determination of attorney fees under § 1988 even though damage award, while far lower than plaintiff sought, was not nominal and award achieved "significant nonmonetary result not only for [plaintiff] but for the community in general").

## IV.

## Conclusion

The City of Bellevue has effectively regulated adult cabarets out of existence. It has done this through the use

of ordinances that are not narrowly tailored and do not serve a compelling state interest. Our state constitution says no to this ordinance and so do I.

JOHNSON, J., concurs with SANDERS, J.

After modification, further reconsideration denied August 21, 1997.